## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **HEATHER HILGERS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **15 C 3572** |
| **v.** | ) | |
| | ) | **Judge John Z. Lee** |
| **ROTHSCHILD INVESTMENT** | ) | |
| **CORPORATION and ERIC KOLKEY,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Heather Hilgers ("Hilgers") has filed suit against her former employer, Rothschild Investment Corporation ("Rothschild"), and one of its employees, Eric Kolkey ("Kolkey"). She brings claims for hostile work environment, *quid pro quo* sexual harassment, sex discrimination, and retaliation pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and the Illinois Human Rights Act ("IHRA"), 775 Ill. Comp. Stat. 5/1 *et seq.* Rothschild and Kolkey (together, "Defendants") have filed a motion for summary judgment as to all claims. For the reasons stated herein, the motion is denied.

## Factual Background

In May 2013, Hilgers interviewed for a summer position with Rothschild, a Chicago-based investment management firm that employs approximately fifty individuals. Defs.' LR 56.1(a)(3) Stmt. ¶¶ 1–2, ECF No. 136. At the time, Hilgers was twenty-two years old and was in her second year of law school. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 1, ECF No. 148.

Hilgers interviewed with Luke Novak ("Novak") and Bart Bonga ("Bonga"). Defs.' LR 56.1(a)(3) Stmt. ¶ 3. According to Hilgers, Novak and Bonga told her during the interview that they were looking for a candidate they could hire for a permanent position at the end of the

summer. *Id.* ¶ 8. Accordingly, Novak asked Hilgers what her salary requirements would be if the firm were to eventually offer her a permanent position. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 1. Hilgers told Novak that she was seeking an annual base salary of $75,000, and, according to Hilgers, Novak responded by saying: "That's absolutely doable, not a problem." *Id.*

A few days after the interview, Hilgers received an offer to join Rothschild's 401(k) practice group as a summer intern from May 20 to August 30, 2013. Defs.' LR 56.1(a)(3) Stmt. ¶¶ 5, 7; *see* Defs.' Ex. D, Offer Letter, at 1, ECF No. 136-5. At the time Hilgers joined the group, it consisted of Novak, Bonga, Eric Kolkey ("Kolkey"), and an administrative staff member. Defs.' LR 56.1(a)(3) Stmt. ¶ 11. Novak and Bonga are partners in the group, each with a fifty-percent interest. *Id.* ¶ 10. They supervise Kolkey, whose title is "Business Development." *Id.* ¶¶ 12–13. Kolkey's job responsibilities include bringing in business by calling and arranging appointments with potential clients. *Id.* ¶ 12. As of May 2013, Kolkey was fifty-two years old and married. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 4.

Hilgers began working at Rothschild in the 401(k) practice group on May 20, 2013. Defs.' LR 56.1(a)(3) Stmt. ¶ 7. She attests that, as a member of the group, she reported to Novak, Bonga, and Kolkey. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 2. At various times over the summer, Kolkey assigned work to Hilgers, asked her to work late, and asked whether she wanted to move her desk into his office so that she could learn business development tasks. *Id.*

Three days after Hilgers started working at Rothschild, Kolkey sent her an e-mail with links to his Facebook page and a website for his social club, the Union League Club of Chicago. *Id.* ¶ 15. He also sent Hilgers a "friend request" on Facebook, which she accepted. *Id.* ¶ 16. On May 30, 2013, upon Kolkey's invitation, Kolkey and Hilgers went to the Union League Club for lunch. *See* Defs.' LR 56.1(a)(3) Stmt. ¶ 21. After the lunch, Kolkey sent Hilgers a Facebook

message asking her to give him her cell phone number.  *Id.*  Hilgers responded by providing her number.  *Id.*

On June 11, 2013, Kolkey invited Hilgers to have lunch with him in his office.  *Id.* ¶ 24.  According to Hilgers, Kolkey told her over lunch that he had "influence" with Novak and Bonga and that she would not be hired into a permanent position at Rothschild unless she got a "sign-off" from Kolkey, as well as from Novak and Bonga.  Pl.'s LR 56.1(a)(3) Stmt. ¶ 16.  Kolkey also told Hilgers during this lunch that "she looked like she walked out of Central Casting," that "she looked like [she was] from a TV show," and that she was "ethereal," by which he meant "other-worldly" or "attractive."  *Id.*

The next day, on June 12, 2013, Hilgers agreed to have a drink with Kolkey at the Union League Club after he repeatedly invited her to do so.  *Id.* ¶ 17.  Hilgers initially intended to have one drink while she waited for her boyfriend's flight to arrive from out of town.  *Id.*  When the flight was canceled, however, she accepted Kolkey's invitation to stay at the club for dinner.  *Id.*  According to Hilgers, Kolkey told her during the dinner that she was "beautiful" and "ethereal" and that her boyfriend "did not deserve her."  Defs.' LR 56.1(a)(3) Stmt. ¶ 32.  Furthermore, Hilgers claims that Kolkey told her he had dreams about her, including a recurring dream in which her hair tasted like candy.  Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 18.  Kolkey also purportedly told Hilgers he "would do anything" to taste her hair and asked whether her hair did, in fact, taste like candy.  *Id.*

After dinner, according to Hilgers, she and Kolkey walked by a chocolate counter, and Kolkey asked her whether she wanted some chocolate.  *Id.* ¶ 19.  Hilgers says that she declined, but Kolkey bought her one of each chocolate at the counter anyway.  *Id.*  For his part, Kolkey claims that Hilgers asked him to buy her the chocolates.  *Id.*  After buying the chocolates, Kolkey

hugged Hilgers. *Id.* ¶ 20. According to Hilgers, because of Kolkey's relatively short height, his head was on her chest when he hugged her. *Id.* Defendants deny this assertion on the basis that, although some evidence indicates that Kolkey's head was indeed on Hilgers's chest, other evidence indicates that his head was only "on her chest level" and not actually touching her. Defs.' Resp. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 20, ECF No. 148. After Hilgers and Kolkey left the Union League Club, Kolkey walked Hilgers home while holding an umbrella over her head. Defs.' LR 56.1(a)(3) Stmt. ¶ 35. The next day, Hilgers purchased chocolates for Kolkey. *Id.* ¶ 37. In her deposition, she explained that she had purchased the chocolates "to lessen the obligation [she] felt towards [Kolkey] because he had already paid for dinners and chocolates." Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 37.

A week later, on June 19, 2013, Kolkey asked Hilgers to come to his office after work for a "surprise." Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 21. Hilgers believed that the "surprise" would be related to a formal offer of permanent employment. *Id.* When she arrived at Kolkey's office, she asked him what the surprise was. *Id.* ¶ 22. According to Hilgers, Kolkey responded: "Well, the surprise was I brought you here to kiss you." *Id.* He then asked whether he could kiss her, and she told him no. *Id.* He also asked whether she would go out for drinks with him, and, likewise, she told him no. *Id.*

What happened next is a matter of considerable dispute. For her part, Hilgers described the rest of the scene in Kolkey's office as follows:

> I wrapped up the conversation as quickly as I could. I stood up, got ready to go out the door. He . . . extends his arm wide for a hug. I just hugged him to try and get it over with, but he grabs my shoulders and pushes me back and says, you know, promise me we'll get together in our next lifetime. And I said, okay. And he, you know, raised on his toes, kissed me on the cheek, and I got out of the office.

*Id.* ¶ 23 (quoting Pl.'s Ex. A, Hilgers Dep., at 101:6–14, ECF No. 144-2). Kolkey denies grabbing Hilgers by the shoulders or kissing her. *Id.*

On June 24, 2013, Hilgers e-mailed Bradley Drake ("Drake") to report the incident in Kolkey's office. *Id.* ¶ 25. Drake is Rothschild's Chief Compliance Officer, Chief Financial Officer, and Executive Vice President. Defs.' LR 56.1(a)(3) Stmt. ¶ 43. Hilgers's e-mail described the events in Kolkey's office on June 19, as well as Kolkey's previous comments about her appearance and his dreams about her. *Id.* In response to the e-mail, Drake met with Kolkey for about forty-five minutes and also met with Novak and Bonga for another forty-five minutes. *Id.* ¶ 47. Then, he met with Hilgers and told her that Mr. Kolkey had "admitted" to everything. *Id.* ¶ 48. Hilgers told Drake that, going forward, she wanted Kolkey to limit his interactions with her. *Id.* ¶ 49. After this discussion with Hilgers, Drake met with Kolkey a second time, reminded him to conduct himself professionally, and advised him to interact with Hilgers only when necessary. *Id.* ¶ 52. In addition, Rothschild required Kolkey to undergo sexual harassment training and placed him on "six months' probation." *Id.* ¶ 56. At some point after June 24, 2013, Kolkey approached Hilgers in Rothschild's lunchroom with tears in his eyes and told her he was "very sorry" for what had happened. *Id.* ¶ 57; Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 35.

Although Kolkey is the only Rothschild employee about whom Hilgers formally complained to Drake, he is not the only employee whose conduct gives rise to this lawsuit. Most notably, the suit is also based upon the conduct and statements of Novak, Vice President Charles Callahan ("Callahan"), and Vice President Dan Hord ("Hord"). First, according to Hilgers, Novak told her in June 2013 that he was having a "really tough time" supervising her and was "uncomfortable" having her work in the office because he was not used to working with women.

Defs.' LR 56.1(a)(3) Stmt. ¶ 67. Novak also told Hilgers that she was the first woman Rothschild had ever hired in a non-administrative capacity, that he had been "adamantly against hiring her," and that she should avoid dressing "like a secretary." Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 3.

With regard to Callahan, Hilgers claims that Callahan told her she should wear a loose tie and a low-cut shirt because that would be a "sexy look." *Id.* ¶ 50. On another occasion, Callahan purportedly told her that she would "look great in a burlap sack." *Id.* ¶ 51. Additionally, after Hilgers reported the incident in Kolkey's office, Callahan stopped by her desk, dropped off an article entitled "Fired for Being Beautiful," and told her that the same thing would happen to her. *Id.* ¶ 52. During his deposition, Callahan denied making these comments about Hilgers, but he admitted to leaving the article on her desk. *Id.* ¶¶ 50–52.

Finally, Hilgers attests that, throughout her employment at Rothschild, Hord regularly ogled her while making slurping noises. *Id.* ¶ 49; Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 68. During her deposition, Hilgers characterized this behavior as inappropriate, and she stated that the ogling and slurping started a few weeks into her time at Rothschild and occurred regularly until she left the firm. Hilgers's Dep. at 91–93; *see* Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 49. In addition, sometime in July, Hord told Hilgers that she should be a "trophy wife." Defs.' LR 56.1(a)(3) Stmt. ¶ 78.

On August 20, 2013, Hilgers sent Novak and Bonga an e-mail to ask whether they had given any further thought as to whether they would be extending her a full-time offer. *Id.* ¶ 83. The next day, Novak and Bonga met with Hilgers and told her that, although she was a very good employee, she would not be receiving a full-time offer because her requested salary of $75,000 was unacceptable. *Id.* ¶ 84; Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 44. Novak and Bonga later testified that they would have made Hilgers a full-time offer if she had been willing to accept a

base salary of approximately $40,000 per year.  Defs.' LR 56.1(a)(3) Stmt. ¶ 85.  According to

Hilgers, however, no one at Rothschild ever made her any kind of full-time offer or mentioned

anything about a salary around $40,000.  Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 85 (citing Pl.'s Ex. W,

Hilgers Decl. ¶ 2, ECF No. 144-24).  Hilgers's last day of work at Rothschild was August 28,

2013.  Defs.' LR 56.1(a)(3) Stmt. ¶ 86.

On February 13, 2014, Hilgers filed charges of sexual harassment, sex discrimination,

and retaliation with the Illinois Department of Human Rights (IDHR) against Rothschild and

Kolkey.  *Id.* ¶ 97.  The IDHR dismissed the claims on November 5, 2015.  *Id.* ¶ 98.  In the

meantime, Hilgers filed the present lawsuit.

## Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a); *accord Shell v. Smith*, 789 F.3d 715, 717 (7th Cir. 2015).  To survive summary

judgment, the nonmoving party must "do more than simply show that there is some metaphysical

doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

586 (1986), and instead must "establish some genuine issue for trial such that a reasonable jury

could return a verdict in her favor," *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th

Cir. 2012).  The Court gives the nonmoving party "the benefit of conflicts in the evidence and

reasonable inferences that could be drawn from it."  *Grochocinski v. Mayer Brown Rowe &*

*Maw, LLP*, 719 F.3d 785, 794 (7th Cir. 2013).  The Court must not make credibility

determinations or weigh conflicting evidence.  *McCann v. Iroquois Mem'l Hosp.*, 622 F.3d 745,

752 (7th Cir. 2010).

<u>**Analysis**</u>

In her First Amended Complaint, Hilgers alleges claims against Rothschild under Title VII and the IHRA for hostile work environment (Counts I and II), *quid pro quo* sexual harassment (Counts III and IV), sex discrimination (Counts VI and VII), and retaliation (Counts VIII and IX). In addition, she alleges a claim against Kolkey under the IHRA for *quid pro quo* sexual harassment (Count V). Defendants have moved for summary judgment with regard to all of Hilgers's claims.

## I.     Hostile Work Environment

First, in moving for summary judgment as to Hilgers's hostile work environment claims, Defendants argue that the hostile work environment claim under the IHRA is untimely. With regard to the merits, Defendants contend that the claims fail because the harassment was not unwelcome, was not pervasive or severe, and did not come from a supervisor. The Court will address each of these arguments in turn.

### A.     Timeliness of Hostile Work Environment Claim Under the IHRA

The IHRA requires a charge of discrimination to be filed with the IDHR or the Equal Employment Opportunity Commission (EEOC) within 180 days of the alleged unlawful employment practice. 775 Ill. Comp. Stat. 5/7A-102(A), (A-1); *see Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 886 n.58 (7th Cir. 2016). Because "[a] sexual harassment claim based on a hostile work environment generally is made up of a series of events rather than a single event," Illinois courts have held that such a claim is "timely as long as it is filed within 180 days of any act that is part of the hostile work environment." *Sangamon Cty. Sheriff's Dep't v. Ill. Human Rights Comm'n*, 908 N.E.2d 39, 47 (Ill. 2009). The act falling within this 180-day period need not be sufficient alone to give rise to a hostile work environment claim; rather, the

act need only be related to the other events creating the hostile work environment. *See id.* at 42, 47–48 (holding that a sexual harassment charge based on a hostile work environment was timely under the IHRA where the only event relating to the charge that fell within the 180-day period before the charge was filed was plaintiff's receipt of a letter forged by a supervisor informing her that she had come in contact with a sexually transmitted disease).

Hilgers filed her charge of sexual harassment with the IDHR on February 13, 2014. Defs.' LR 56.1(a)(3) Stmt. ¶ 97. To the extent this charge was based on a hostile work environment, the charge was timely only if at least one act contributing to the hostile work environment occurred within 180 days before this filing—that is, after August 17, 2013. Among other things, Hilgers bases her hostile work environment claims in part on the conduct of Hord, pointing to evidence that Hord regularly ogled her while making slurping noises throughout her employment at Rothschild. *See* Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 49; Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 68. Although Hilgers does not specify each and every date when this ogling and slurping occurred, she attests that it "happened pretty regularly," beginning "just a couple weeks" after she started her employment and continuing until "[she] stopped working at Rothschild." Hilgers Dep. at 93:4–8. Her last day of work was August 28, 2013. Defs.' LR 56.1(a)(3) Stmt. ¶ 86. Taking this evidence together and drawing reasonable inferences in Hilgers's favor, a jury could infer that at least one instance of Hord's ogling and slurping occurred between August 17, 2013, and her last day of work on August 28, 2013, and that this act contributed to a hostile work environment claim. Defendants therefore are not entitled to summary judgment on Hilgers's hostile work environment claim under the IHRA on grounds of untimeliness.

## B.     Whether the Sexual Harassment Was "Welcome"

Turning to the merits, Defendants first argue that Hilgers's hostile work environment claims fail because she has not established that the alleged sexual harassment was not unwelcome.  To prevail on a sexual harassment claim based on a hostile work environment, a plaintiff must show, among other things, that the sexual conduct, advances, or requests at issue were unwelcome.  *See Lapka v. Chertoff*, 517 F.3d 974, 982 (7th Cir. 2008) (citing *Erickson v. Wis. Dep't of Corr.*, 469 F.3d 600, 604 (7th Cir. 2006)) (holding that, to prove a hostile work environment claim under Title VII, a plaintiff must show that "she was (1) subjected to unwelcome sexual conduct, advances, or requests; (2) because of her sex; (3) that were severe or pervasive enough to create a hostile work environment; and (4) that there is a basis for employer liability"); *Rozsavolgyi v. City of Aurora*, 58 N.E.3d 65, 75 (Ill. App. Ct. 2016) (citing 775 Ill. Comp. Stat. 5/2-101(E)) (noting that the IHRA defines sexual harassment in pertinent part as "any unwelcome sexual advances or requests for favors of any conduct of a sexual nature").  Whether harassment is unwelcome "presents a difficult question of proof turning largely on credibility determinations committed to the factfinder."  *Hrobowski v. Worthington Steel Co.*, 358 F.3d 473, 476 (7th Cir. 2004).

According to Defendants, the evidentiary record conclusively shows that Hilgers welcomed the alleged sexual harassment from Kolkey because she had lunches and a dinner with him, voluntarily hugged him, "allowed" him to walk her home while holding an umbrella over her head, and bought him chocolates.  Defs.' Mem. Supp. at 8, ECF No. 135.  In addition, Defendants emphasize that Hilgers never formally complained about the alleged sexual harassment from other employees at Rothschild.  *Id.*  Viewing this evidence "under the lens of

common sense," Defendants argue, no reasonable jury could find that any of the sexual harassment was unwelcome. *Id.* at 8–9.

This argument is unpersuasive to say the least. Ample evidence in the record would allow a reasonable jury to conclude that Hilgers did not welcome the various forms of sexual harassment at issue. For example, there is evidence that, when Kolkey asked Hilgers whether he could kiss her, she told him no. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 22. After Kolkey nevertheless grabbed her by the shoulders and kissed her anyway, she lodged a formal complaint to report this incident, as well as Kolkey's previous comments to her about her appearance and his dreams about tasting her hair. *Id.* ¶ 23; Defs.' LR 56.1(a)(3) Stmt. ¶ 43. This evidence is enough for a fact finder to conclude that Kolkey's advances and comments were unwelcome. *See, e.g.*, *Hrobowski*, 358 F.3d at 476 (holding that a reasonable jury could find that harassment was unwelcome where plaintiff complained about the harassment to his managers); *Carr v. Allison Gas Turbine Div., Gen. Motors Corp.*, 32 F.3d 1007, 1010–11 (7th Cir. 1994) (rejecting argument that sexual harassment was "welcome" where plaintiff complained to her supervisor about the harassment and plaintiff was a lone female employee among many men, even though plaintiff often responded to her co-workers' vulgar, harassing comments with vulgar comments of her own).

Furthermore, just because Hilgers did not formally complain about the behavior of the other employees does not conclusively show that she welcomed their conduct or statements. To this point, Hilgers explained during her deposition that she was reluctant to make additional complaints because she did not want to jeopardize her long-term professional opportunities at Rothschild. *See* Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 28 ("[H]onestly, I was 22 and new. You know, it was my first job. I was really excited about it. I didn't want to make waves[,] . . . burn any

bridges, or upset the people who would be, you know, hiring me full time." (quoting Hilgers Dep. at 74–75, 78)); *id.* ¶ 69 ("[A]gain, any time you report, that comes with a risk. If I report every single person in the office, I was really at risk for no continued employment." (quoting Hilgers Dep. at 130)). Crediting this testimony, a jury could reasonably conclude that Hilgers's decision not to report other employees' conduct falls short of establishing that she welcomed their inappropriate conduct and statements.

## C.     Whether the Sexual Harassment Was Sufficiently Pervasive or Severe

Next, Defendants argue that they are entitled to summary judgment on Hilgers's hostile work environment claims because the alleged sexual harassment was not sufficiently pervasive or severe to give rise to a hostile work environment. Under Title VII, to prevail on a sexual harassment claim based on a hostile work environment, a plaintiff must prove that "conduct was severe or pervasive enough to create a hostile work environment." *Quantock v. Shared Mktg. Servs., Inc.*, 312 F.3d 899, 903 (7th Cir. 2002).[1] The conduct must be "so severe or pervasive as to alter the conditions of [the plaintiff's] employment and create an abusive working environment." *Id.* (quoting *Hilt-Dyson v. City of Chi.*, 282 F.3d 456, 462–63 (7th Cir. 2002)). In addition, the conduct must have been both objectively and subjectively offensive. *Id.* (citing *Hilt-Dyson*, 282 F.3d at 463).[2]

---

[1]     The parties' briefing on this issue treats the question of whether conduct is sufficiently "severe or pervasive" as involving an inquiry that is identical under Title VII and the IHRA. The Court therefore assumes for purposes of this motion that the analysis of this issue is the same with regard to both of Hilgers's hostile work environment claims. *Cf. Bagwe*, 811 F.3d at 879 n.39 (noting in a case involving race discrimination that the analytical framework for Title VII and the IHRA is "essentially identical").

[2]     In addition to arguing that Hilgers has not raised a genuine dispute as to whether the conduct at issue was sufficiently pervasive or severe to create a hostile work environment, Defendants contend that there is no evidence that Hilgers was subjectively offended by the conduct. Defs.' Mem. Supp. at 9. The Court rejects this argument for the same reasons it rejected Defendants' argument, discussed *supra*, that Hilgers welcomed the alleged harassment.

The determination of whether conduct is so severe or pervasive as to create a hostile work environment is an issue of fact. *See Lambert v. Peri Formworks Sys., Inc.*, 723 F.3d 863, 866 (7th Cir. 2013). In addition, this determination depends on the totality of the circumstances, and the trier of fact must consider factors such as the conduct's frequency, its severity, whether it is physically threatening or humiliating, or whether it unreasonably interferes with an employee's work performance. *See Quantock*, 312 F.3d at 904 (citing *Murray v. Chi. Transit Auth.*, 252 F.3d 880, 889 (7th Cir. 2001).

"[H]arassing conduct does not need to be both severe *and* pervasive" to be actionable in a claim for hostile work environment. *Jackson v. Cty. of Racine*, 474 F.3d 493, 499 (7th Cir. 2007) (citing *Cerros v. Steel Tech., Inc.*, 398 F.3d 944, 950 (7th Cir. 2005)). Rather, "conduct that is not particularly severe but that is an incessant part of the workplace environment may, in the end, be pervasive enough and corrosive enough that it meets the standard for liability." *Id.* As such, the Seventh Circuit has held that sexist, sexual, or gender-based comments, when made on a regular basis, are sufficient to create a hostile work environment. *See Passananti v. Cook Cty.*, 689 F.3d 655, 668 (7th Cir. 2012) ("There is no question that gender-based comments and epithets, when used pervasively in the workplace, can meet the standard for severe or pervasive harassment."); *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 789 (7th Cir. 2007) (holding that a supervisor's comments were sufficiently severe to create a hostile work environment where he made "at least eighteen sexist or sexual comments" within a period of ten months).

Here, Hilgers has raised a triable issue of fact as to whether she was subjected to inappropriate conduct, as well as sexist, sexual, or gender-based comments, that was sufficiently pervasive to create a hostile work environment. First, during the approximately three-month period of her employment at Rothschild, she attests that she was the target of numerous sexist or

gender-based comments about her appearance or clothing. For example, on June 11, 2013, Kolkey told Hilgers that she was "ethereal," that she "looked like [she] was from a TV show," and that she looked like she had "walked out of Central Casting." Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 16. The next day, he again told her she was "ethereal" and "beautiful," and he commented that her boyfriend "did not deserve her." Defs.' LR 56.1(a)(3) Stmt. ¶ 32. Kolkey also described to her a recurring dream that he had in which Hilgers's hair tasted like candy. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 18. Callahan advised Hilgers to wear a low-cut shirt because that would be a "sexy look," and, on a separate occasion, he told her she would "look great in a burlap sack." Id. ¶¶ 50–51. Novak, too, gave Hilgers wardrobe advice, telling her to avoid dressing "like a secretary." Id. ¶ 3. Hilgers was subjected to other types of gender-based comments as well. For example, Novak told her he was "uncomfortable" supervising her because she was a woman. Defs.' LR 56.1(a)(3) Stmt. ¶ 67. Callahan warned her that she would be fired for being beautiful. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 52. And Hord told her that she should be a "trophy wife." Defs.' LR 56.1(a)(3) Stmt. ¶ 78.

In addition to these comments, Hilgers was subjected to other sexually inappropriate behavior and nonconsensual touching. Most notably, she has offered evidence that Kolkey grabbed her by the shoulders and kissed her in his office—immediately after she told him not to—and that, on a separate occasion, Kolkey put his head on her chest during a hug. Id. ¶¶ 20, 22–23. Hilgers has also presented evidence that Hord regularly ogled her while making slurping noises throughout the duration of her employment. Id. ¶ 49; Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 68.

Based upon this evidence, a jury could reasonably conclude that the conduct and comments at issue were sufficiently pervasive to create a hostile work environment in the three-month period when Hilgers was working at Rothschild. See Passananti, 689 F.3d at 668;

*Boumehdi*, 489 F.3d at 789.[3]  As such, Defendants are not entitled to summary judgment on the basis that the conduct and comments were not pervasive or severe.

### D.      Whether the Sexual Harassment Came From a Supervisor

Last, Defendants move for summary judgment on Hilgers's hostile work environment claims on the basis that she has failed to establish employer liability.  An employer is liable for a hostile work environment claim under Title VII or the IHRA if the plaintiff can show that "a supervisor participated in the harassment that created the hostile work environment." *Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 390 (7th Cir. 2010); *see Nischan v. Stratosphere Quality, LLC*, 2017 WL 3275149, at *5–6 (7th Cir. Aug. 2, 2017) (using the same analytical framework to analyze the issue of employer liability for purposes of hostile work environment claims brought under Title VII and the IHRA).[4]

---

[3]      In support of their argument that Hilgers has failed to raise a genuine dispute as to pervasiveness or severity, Defendants rely on several cases in which the Seventh Circuit held that conduct was not sufficiently pervasive or severe to constitute sexual harassment.  Those cases, however, are distinguishable from the present case—as well as from *Passananti v. Cook County*, 689 F.3d 655 (7th Cir. 2012), and *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781 (7th Cir. 2007), discussed *supra*—because they involved conduct or comments that were relatively more isolated and infrequent.  *See* Defs.' Mem. Supp. at 10–12 (citing *McPherson v. Waukegan*, 379 F.3d 430, 434–39 (7th Cir. 2004); *Patt v. Family Health Sys., Inc.*, 280 F.3d 749 (7th Cir. 2002); *Weiss v. Coca-Cola Bottling Co. of Chi.*, 990 F.2d 333, 337 (7th Cir. 1993)).

As a separate matter, the Court also takes note of Defendants' reliance on *Worth v. Tyer*, 276 F.3d 249 (7th Cir. 2001).  According to Defendants, *Worth* held that "an allegation that an employee's supervisor 'came up alongside her and stroked his face, hair, and nose and . . . stuck his hand down her dress and placed it directly onto her breast . . . approximately one inch away from her nipple and kept it there for several seconds' was insufficient to constitute a hostile work environment."  Defs.' Reply at 6, ECF No. 149 (quoting *Worth*, 276 F.3d at 268).  This is a blatant mischaracterization of *Worth*.  *Worth* held that these allegations *were* sufficient to constitute a hostile work environment.  *Worth*, 276 F.3d at 268 (describing these allegations and holding that "we cannot conclude that the district court erred in concluding that Worth's work environment was hostile").

[4]      Alternatively, an employer can be liable for a hostile work environment claim under Title VII and the IHRA if the plaintiff can show that the employer was "negligent in discovering or remedying harassment by [her] coworkers."  *Montgomery*, 626 F.3d at 390; *see Nischan*, 2017 WL 3275149, at *5–6.  Because the Court concludes that Hilgers has raised a genuine dispute of fact as to whether a supervisor participated in the harassment that created a hostile work environment, the Court need not address whether Hilgers could also prevail against Rothschild on a negligence theory.

The definition of a "supervisor" under Title VII differs from the definition of this term under the IHRA.  Under Title VII, a person is a supervisor if he or she has the authority to "take tangible employment actions against the plaintiff, *i.e.*, to effect a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2443 (2013) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)); *accord Nischan*, 2017 WL 3275149, at *5; *Jajeh v. Cty. of Cook*, 678 F.3d 560, 568 (7th Cir. 2012) ("[A] supervisor will generally have the authority to hire, fire, promote, demote, discipline or transfer a plaintiff." (internal quotation marks omitted)).  By contrast, under the IHRA, a person is a supervisor as long as he or she works for the employer in some general supervisory role.  *See Sangamon*, 908 N.E.2d at 45.  As such, direct supervisory authority that makes someone a supervisor for purposes of Title VII is sufficient but not necessary to make someone a supervisor for purposes of the IHRA.  *See id.*; *see also Nischan*, 2017 WL 3275149, at *5. Under either statute, whether a person is a "supervisor" for purposes of an employment discrimination or harassment claim turns on issues of fact.  *See, e.g.*, *Valentine v. City of Chi.*, 452 F.3d 670, 678 (7th Cir. 2006).

Here, Hilgers has offered sufficient evidence from which a jury could conclude that Kolkey was her supervisor for purposes of Title VII and the IHRA.  In particular, Hilgers stated during her deposition that, on June 11, 2013, Kolkey told her she would not receive an offer for a permanent position unless she first got a "sign-off" from him, as well as from Novak and Bonga.  Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 16.  Drawing reasonable inferences in Hilgers's favor, a jury could conclude from this evidence that Kolkey had the authority to "effect a significant change in [her] employment status" in that he had the power to prevent her from being hired into a

permanent position. *Vance*, 133 S. Ct. at 2443 (internal quotation marks omitted). The fact that Kolkey shared authority with Novak and Bonga to hire Hilgers—in other words, the fact that Kolkey did not have the power to unilaterally hire Hilgers without Novak's and Bonga's approval—cannot be dispositive of whether Kolkey was Hilgers's supervisor. To hold otherwise would make it too easy for employers to avoid liability under Title VII by dividing responsibility for such hiring decisions among multiple employees. *See Phelan v. Cook Cty.*, 463 F.3d 773, 784 (7th Cir. 2006) ("It would be an odd result if an employer could escape the possibility of strict liability for supervisor harassment simply by scattering supervisory responsibilities amongst a number of individuals, creating a Title VII supervisory Hydra."), *overruled on other grounds by Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016).

In sum, Hilgers has pointed to evidence from which a reasonable jury could find that Kolkey participated in the harassment that created a hostile work environment and that Kolkey was her supervisor.[5] As such, she has created a genuine dispute of material fact as to the issue of employer liability in support of her hostile work environment claims. *See Montgomery*, 626 F.3d at 390. Defendants' motion for summary judgment as to these claims is accordingly denied.

---

[5] In a footnote, Defendants argue that, even if Hilgers can show that Kolkey was her supervisor, Defendants can still avoid liability for sexual harassment under the "*Ellerth/Faragher* affirmative defense." Defs.' Mem. Supp. at 13 n.4. Rather than elaborating on the details of this defense here, it suffices to say that the defense is categorically unavailable "when the supervisor's harassment culminates in a tangible employment action." *Huff v. Sheahan*, 493 F.3d 893, 900 (7th Cir. 2007) (quoting *Ellerth*, 524 U.S. at 765). In her response, Hilgers argues that the alleged harassment culminated in a tangible employment action—namely, the failure to hire or promote her into a permanent position—and that the *Ellerth/Faragher* affirmative defense thus is unavailable. Pl.'s Resp. at 11 n.2. Hilgers's position on this issue finds support in the case law, and Defendants leave it uncontroverted in their reply brief. *See Ellerth*, 524 U.S. at 761 ("A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."). The Court therefore need not address this issue further.

## II.    *Quid Pro Quo* Sexual Harassment

Next, Defendants have moved for summary judgment with regard to all three of Hilgers's IHRA claims for *quid pro quo* sexual harassment on the basis that they are untimely.  In addition, they have moved for summary judgment as to Hilgers's *quid pro quo* sexual harassment against Kolkey on the basis that Hilgers has failed to present a genuine dispute as to whether Kolkey explicitly or implicitly conditioned her full-time employment on a sexual request.[6]  For the reasons that follow, neither argument has merit.

### A.    Timeliness of *Quid Pro Quo* Sexual Harassment Claims Under the IHRA

As noted above, the IHRA requires that a charge of discrimination be filed with the IDHR or the EEOC within 180 days of the alleged unlawful employment practice.  775 Ill. Comp. Stat. 5/7A-102(A), (A-1).  The parties agree that this 180-day period begins to run for a *quid pro quo* sexual harassment claim when all the elements of the claim are present.  *See* Pl.'s Resp. at 15, ECF No. 143; Defs.' Reply at 3 (conceding that "a statute of limitations generally does not begin to run until the elements of a claim are present").  Thus, whether Hilgers's *quid pro quo* sexual harassment claims are timely depends on the elements required to prove those claims.  According to Hilgers, one of the elements is a tangible employment action.  Pl.'s Resp. at 15.  As such, Hilgers argues, her claim accrued on August 21, 2013, the date when she was informed that she would not be receiving an offer of permanent employment at Rothschild.  *Id.*

As Defendants acknowledge in their opening brief, a plaintiff seeking to prevail on a claim for *quid pro quo* sexual harassment must prove that "her reactions to [the harasser's] alleged advances led to an adverse employment action."  Defs.' Mem. Supp. at 7–8 (citing

---

[6]    Defendants also argue that Hilgers's *quid pro quo* sexual harassment claims fail because, as with regard to her hostile work environment claims, Hilgers has failed to raise a genuine dispute as to whether the alleged harassment was unwelcome and as to whether Kolkey was her supervisor.  The Court rejects these arguments for the same reason it rejected them *supra*.

*Bryson v. Chi. State Univ.*, 96 F.3d 912, 915 (7th Cir. 1996)); *see Bryson*, 96 F.3d at 915 (employing a five-part test used by other circuits to determine liability for *quid pro quo* sexual harassment claim under Title VII, and explaining that one required element of this test is that "the employee's reaction to the supervisor's advances affected a tangible aspect of her employment"); *see also Farfaras v. Citizens Bank & Tr. of Chi.*, 433 F.3d 558, 564 (7th Cir. 2006) (citing *Bryson*, 96 F.3d at 915); *Marchioni v. Bd. of Educ. of City of Chi.*, 341 F. Supp. 2d 1036, 1043 (N.D. Ill. 2004); *Szkoda v. Ill. Human Rights Comm'n*, 706 N.E.2d 962, 969 (Ill. App. Ct. 1998) (applying the five-part test described in *Bryson* to a *quid pro quo* sexual harassment claim brought under the IHRA in the housing context).[7]

It is undisputed that Hilgers suffered an adverse employment action on August 21, 2013, when she was informed that she would not be receiving an offer to work at Rothschild on a permanent basis. *See* Defs.' LR 56.1(a)(3) Stmt. ¶ 84; Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 44. Because August 21 was the date on which she suffered an adverse employment action, that is the date when her *quid pro quo* sexual harassment claims accrued. In turn, because Hilgers filed her charge of discrimination with the IDHR on February 13, 2014—176 days later—her charge was timely. Thus, summary judgment in Defendants' favor on grounds of untimeliness is unwarranted.

---

[7] Defendants make an about-face in their reply brief, asserting that "Seventh Circuit authority does not require an actual adverse employment action to sustain a *quid pro quo* claim" and citing *Bryson* in support. Defs.' Reply at 3. This argument is unavailing for two reasons. First, "[i]t is well established that arguments raised for the first time in a reply brief are waived." *Nationwide Ins. Co. v. Cent. Laborers' Pension Fund*, 704 F.3d 522, 526 (7th Cir. 2013). This rule applies with extra force where, as here, Defendants not only raised this argument for the first time in their reply, but also expressly took the opposite position in their opening brief. Second, even if the argument were not waived, the Court would still reject it because, as discussed above, *Bryson* contradicts, rather than supports, Defendants' assertion that a plaintiff need not show an adverse employment action to prevail on a claim for *quid pro quo* sexual harassment.

## B.    *Quid Pro Quo* Sexual Harassment Claim Against Kolkey

Next, Defendants argue that Hilgers cannot prevail on her *quid pro quo* sexual harassment claim against Kolkey because she has failed to offer evidence that Kolkey explicitly or implicitly conditioned her permanent employment with Rothschild on the fulfillment of a sexual request.  As a threshold matter, Defendants cite no case law showing that a plaintiff must prove such an explicit or implicit condition as an element of *quid pro quo* sexual harassment claim.[8]  Rather, as Defendants acknowledge in their brief, courts generally have held that a plaintiff seeking to prevail on a *quid pro quo* sexual harassment a claim must prove: "(1) that she or he is a member of a protected group, (2)  the sexual advances were unwelcome, (3) the harassment was sexually motivated, (4) the employee's reaction to the supervisor's advances affected a tangible aspect of her employment, and (5) respondeat superior has been established." *Bryson*, 96 F.3d at 915 (discussing Title VII); *accord Szkoda*, 706 N.E.2d at 969 (Ill. App. Ct. 1998) (discussing the IHRA).

Even assuming, for the sake of argument, however, that such an explicit or implicit condition were a separate element of a *quid pro quo* sexual harassment claim, Defendants still would not be entitled to summary judgment on this basis.  Hilgers has presented evidence that, on June 11, 2013, while she was eating lunch in Kolkey's office upon his invitation, Kolkey expressly told her that he had "influence" with Novak and Bonga and that she would need his "sign-off" before receiving an offer of full-time employment.  Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 16. During this same conversation, Kolkey told Hilgers she was "ethereal" and made other comments about her physical appearance.  *Id.*  The next day, he repeatedly invited her to have

---

[8]     In connection with this argument, Defendants cite *Heuer v. Weil-McLain*, 203 F.3d 1021, 1022 (7th Cir. 2000).  Defs.' Mem. Supp. at 14–15; Defs.' Reply at 11.  *Heuer*, however, does not discuss *quid pro quo* sexual harassment claims and, therefore, does not support Defendants' position.

after-work drinks with him until she gave in and agreed to do so.  *Id.* ¶ 17.  He also made further comments about her physical appearance, told her about his recurring dream in which her hair tasted like candy, and asked whether her hair did actually taste like candy.  *Id.* ¶ 78.  A week later, he asked Hilgers if he could kiss her.  *Id.* ¶ 22.  And, when she said no, he kissed her anyway.  *Id.* ¶ 23.  Crediting Hilgers's evidence and considering the timing of these events, a jury could reasonably infer that Kolkey implicitly conditioned Hilgers's permanent employment on her cooperation with his advances.  Defendants' motion for summary judgment as to Hilgers's *quid pro quo* sexual harassment claim against Kolkey is therefore denied.

## III.    Sex Discrimination and Retaliation

Finally, Defendants have moved for summary judgment with regard to Hilgers's claims for sex discrimination and retaliation under Title VII and the IHRA.  In their briefing, Defendants join their arguments regarding these claims into a single discussion.  Defs.' Mem. Supp. at 15–18.  The Court will likewise discuss the claims together here.

To prove a claim for sex discrimination under Title VII or the IHRA, a plaintiff must prove that the evidence, considered as a whole, would permit a reasonable fact finder to conclude that her gender caused an adverse employment action.  *See Ortiz*, 834 F.3d at 765; *Steinhauer v. DeGolier*, 359 F.3d 481, 483 (7th Cir. 2004); *see also Bagwe*, 811 F.3d at 879 n.39.  One of the ways—although not the only way—that a plaintiff can make this showing is by using the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  S*ee David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017) (noting that the *McDonnell Douglas* framework remains "a means of organizing, presenting, and assessing circumstantial evidence in frequently recurring factual patterns found in discrimination cases," but is "not the only way").  Under this framework, a plaintiff alleging sex discrimination based

upon a failure to hire or promote must establish a *prima facie* case by showing that: (1) she is a member of a protected class; (2) she applied and was qualified for an open position; (3) she was rejected for the position; and (4) the employer either left the position open or filled it with a similarly situated person not in the plaintiff's protected class. *See, e.g.*, *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 724 (7th Cir. 2005). If the plaintiff proves a *prima facie* case, the employer must articulate a legitimate, nondiscriminatory reason for the adverse employment action in question. *Id.* In turn, if the employer articulates such a reason, the burden then shifts back to the plaintiff to show that the employer's proffered reason is a mere pretext for discrimination. *Id.*

To prove a retaliation claim under Title VII or the IHRA, a plaintiff must show that a reasonable jury weighing the evidence as a whole could find that (1) she engaged in a protected activity, (2) she suffered an adverse employment action, and (3) there was a causal connection between the protected activity and the adverse employment action. *Williams v. Office of Chief Judge of Cook City. Ill.*, 839 F.3d 617, 627 (7th Cir. 2016); *Bagwe*, 811 F.3d at 887–88. Alternatively, as with a sex discrimination claim, a plaintiff can utilize a version of the *McDonnell Douglas* burden-shifting framework to forestall summary judgment. *See Bagwe*, 811 F.3d at 887; *Northington v. H & M Int'l*, 712 F.3d 1062, 1065 (7th Cir. 2013) (citing *Amrhein v. Health Care Serv. Corp.*, 546 F.3d 854, 859 (7th Cir. 2008)).

Defendants argue that no reasonable jury could return a verdict in Hilgers's favor with regard to her claims for sex discrimination and retaliation. In support, they primarily argue that the adverse employment action at issue—that is, Rothschild's failure to hire or promote Hilgers into a permanent position at the end of the summer—was based solely on Hilgers's unreasonably

high salary demand, rather than on discrimination or retaliation.[9]   These arguments are unpersuasive.  Ample evidence in the record, considered as a whole, would allow a jury to conclude that Rothschild's failure to hire or promote Hilgers was the result of discrimination or retaliation.

First, a reasonable jury could infer a discriminatory reason for Rothschild's failure to hire Hilgers based upon evidence of Hilgers's conversation with Novak in June 2011.  During this conversation, according to Hilgers, Novak told her he was having a "really tough time" supervising her and was "uncomfortable" having her work in the office because he was not used to working with women.  Defs.' LR 56.1(a)(3) Stmt. ¶ 67.  In addition, Novak told Hilgers that she was the first woman who Rothschild had ever hired in a non-administrative capacity and that he had been "adamantly against hiring her."  Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 3.  Drawing reasonable inferences in Hilgers's favor, a jury could conclude that, if Novak had been "adamantly against" hiring Hilgers at the outset of the summer because of her gender, then he may similarly have harbored a gender-based opposition to hiring her on a permanent basis at the end of the summer.  Moreover, in light of Novak's purported assurances at the beginning of the summer that a $75,000 base salary would be "absolutely doable," Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 1, a jury could reasonably discredit Defendants' explanation that they declined to offer Hilgers a permanent position merely because her requested base salary was unreasonably high.

---

[9]     Defendants also argue that Hilgers's claims necessarily fail because she has failed to point to a similarly situated comparator.  As discussed above, however, proof regarding a similarly situated comparator is required only if a plaintiff relies upon the *McDonnell Douglas* burden-shifting framework.  For the reasons explained below, Hilgers has offered sufficient proof in support of her claims without resorting to that framework.  *See David*, 846 F.3d at 224 ("In adjudicating a summary judgment motion [for discrimination claims], the question remains: has the non-moving party produced sufficient evidence to support a jury verdict of intentional discrimination?"); *Ortiz*, 834 F.3d at 765 (the legal standard "is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action").

Ultimately, it is the province of the jury to weigh this conflicting evidence and decide whose version of the facts to believe.  *See McCann*, 622 F.3d at 752.

Additionally, a jury could reasonably conclude that Rothschild failed to offer Hilgers a permanent position as a means of retaliating against her for engaging in a protected activity— that is, for lodging a complaint about the incident in Kolkey's office.  *See Bagwe*, 811 F.3d at 888 (explaining that complaints or accusations of discriminatory conduct qualify as protected activity).  In particular, a jury could find a causal connection between this protected activity and the adverse employment action in question.  Hilgers's complaint and the decision not to offer her a permanent position occurred within less than two months of one another.  *See* Pl.'s LR 56.1(b)(3)(C) Stmt. ¶¶ 25, 44.  Furthermore, her complaint made Kolkey visibly upset.  *Id.* ¶ 35; Defs.' LR 56.1(a)(3) Stmt. ¶ 57.  In light of Hilgers's evidence that Kolkey had input in the decision whether to hire her on a permanent basis, a reasonable jury could infer based on the timing of the events and Kolkey's reaction to the complaint that the complaint was causally connected to Rothschild's failure to hire or promote Hilgers.  *See Sitar v. Ind. Dep't of Transp.*, 344 F.3d 720, 728–29 (7th Cir. 2003) (holding that plaintiff offered sufficient evidence of causation in support of retaliation claim where evidence showed that plaintiff's manager was "visibly upset" by the plaintiff's formal complaint of sex discrimination and hostile work environment against him, even though the complaint was lodged more than three months before the adverse employment action in question).  For these reasons, Defendants are not entitled to summary judgment as to Hilgers's claims for sex discrimination and retaliation.

## <u>Conclusion</u>

For the reasons stated herein, Defendants' motion for summary judgment [134] is denied. A status hearing is set for October 4, at 9:00 a.m., at which time the parties should be prepared to set deadlines for pretrial filings, a date for the pretrial conference, and a date for trial.

**IT IS SO ORDERED.**     **ENTERED   9/20/17**

_____
**John Z. Lee**
**United States District Judge**